IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| CURTIS REED HOSENDOVE, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:14-cv-00068 |
| ) | Senior Judge Haynes |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

Plaintiff, Curtis Reed Hosendove, filed this action under 42 U.S.C. § 405(g) against the Defendant Carolyn Colvin, Acting Commissioner of Social Security, seeking judicial review of the Commissioner's denial of his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.

Before the Court is Plaintiff's motion for judgment on the record (Docket Entry No. 16) contending, in sum, that the Administrative Law Judge ("ALJ") erred by failing to consider Plaintiff's diabetes; by failing to determine a function-by-function residual functional capacity ("RFC"); by failing to consider Plaintiff's obesity; and by not correctly considering the evaluations of Drs. Pettigrew and Gann. The Commissioner contends that the ALJ's decision is supported by substantial evidence.

After the evidentiary hearing, the ALJ evaluated Plaintiff's claim for DIB and SSI using the sequential evaluation process set forth at 20 C.F.R. § 416.920. (Docket Entry No. 11, Administrative Record at 14-15).¹ The ALJ determined that Plaintiff met the insured status

---

¹The Court's citations are to the pagination in the Administrative Record, not in the electronic case filing system.

requirements through December 31, 2015. Id. at 15. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2009, the alleged onset date. Id. At step two, the ALJ determined that Plaintiff has the following severe impairments: obesity, right knee osteoarthritis and psychotic disorder. Id. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 16. At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform medium work that includes lifting/carrying 50 pounds occasionally and 25 pounds frequently, sitting for six hours in an eight-hour workday and standing and/or walking for six hours in an eight-hour workday, but not carrying out complex or detailed instructions and not maintaining attention or concentration for more than two hours without interruption. Id. at 17. At step five, the ALJ stated that Plaintiff is not capable of performing past relevant work, but is capable of performing jobs that exist in significant numbers in the national economy. Id. at 22. The ALJ concluded that Plaintiff was not disabled within the meaning of the Act and was not entitled to DIB or SSI. Id. at 23. Following this decision, Plaintiff requested a review. Id. at 6-8. On April 11, 2014 the Appeals Council denied Plaintiff's request for review. Id. at 1-4.

### A. Review of the Record

Plaintiff originally alleged an onset date of June 1, 2009 that was later amended to June 30, 2010. (Docket Entry No. 11 at 53 and 32). On July 12, 2010, Plaintiff visited Frank Brannon, LPC. Id. at 307. The note says "[Patient] reports that he has lost his job, gotten divorced, and remarried. ... He continues to take his meds as prescribed. He is not eating or sleeping well. We discussed his concerns about adjusting to his new life and surroundings." Id.

On August 3, 2010, Plaintiff visited Heritage Medical Associates. Id. at 245. Plaintiff presented for "[follow up] [multiple] [medical] problems," and was noted with a medical history of schizophrenia, hyperlipidemia, [diabetes mellitus] and diverticulosis. Id. Also, on August 3, 2010, Plaintiff was evaluated by "Physicians & Surgeons." Id. at 389, 445. Plaintiff's only noted complaint was "6 mo appt due, get established." Id. Plaintiff was found to have a cardiovascular edema. Id.

On August 16, 2010, Plaintiff visited Brannon. Id. at 306. Brannon noted "[Patient] reports that he is adjusting to the move to a small town. He continues to take his meds as perscribed (sic). He is eating and sleeping well. We discussed his concerns." Id. On September 20, 2010, Plaintiff returned to Brannon. Id. at 299. On this visit, "[Plaintiff] report[ed] that he is under a lot of self imposed stress and boredom. We looked at why?" Id. Also, on September 20, 2010, Plaintiff visited Dr. Samuel Okpaku. Id. at 471. Plaintiff "state[d] that he was a little bit stressed out trying to adjust to his new environment." Id. On October 18, 2010, Plaintiff visited Brannon. Id. at 298. The report states only, "[patient] presented." Id. On the same day, Plaintiff also visited Dr. Okpaku. Id. at 305. Plaintiff's mood was reported as "happy." Id.

On November 2, 2010, Plaintiff visited "Physicians & Surgeons" for a and with complaints of mood swings. Id. at 390, 438. Plaintiff was noted to have a "flat" mood, with the comment, "judgment?" Id. On November 18, 2010, Plaintiff visited Brannon. Id. at 297. Plaintiff reported that "he is dealing with a lot of stress," but that "[h]e has been able to deal with his voices." Id. On this date, Plaintiff also visited Dr. Okpaku, who reported that "[m]ood is fair[.] States he is coping with all the responsibilities." Id. at 304.

On November 24, 2010, Dr. Thomas Pettigrew, Ed.D. conducted a psychological

evaluation. Id. at 262-65. Plaintiff stated that he was disabled by "'schizophrenia, depression, suicidal, diabetes, high cholesterol, chemical imbalance,'" but did not bring any medical records to the evaluation. Id. at 262. Plaintiff reported that he had previously been employed by "Metro Nashville Board of Education" until July when "they laid everybody off." Id. Plaintiff admitted a past history of alcohol and drug abuse, but stated that he no longer used either. Id. at 263.

Dr. Pettigrew noted that "[Plaintiff] may have been quite suggestible when questioned about various symptoms." Id. at 263. For his activities of daily living, Plaintiff reported: "[h]e me[t] all of his personal needs independently;" he drove; he did some household chores and some cooking; and he shopped both alone and with his wife. Id. at 264. Dr. Pettigrew noted that "[w]hen asked if he experiences suicidal ideation [Plaintiff] responded immediately, 'oh yeah!' However, he denied any suicidal intention or plan." Id. Dr. Pettigrew concluded:

> Clinical information derived from this evaluation is not thought to have sufficient validity to definitively support a diagnosis of schizophrenia or any other psychotic disorder. The examiner recommends that further testing involving validity measures be considered. Mr. Hosendove demonstrated that he is able to understand, remember and carry out simple verbal instructions. He was attentive and showed no signs of distractibility from internal or external stimuli. He did not appear clinically depressed. He exhibited no evidence of a thought disorder, mania or agitation. Historical reliability was considered somewhat questionable.

Id. at 265.

On November 30, 2010, Plaintiff was evaluated at "Physicians & Surgeons." Id. at 391, 437. Plaintiff "[complained of] head cong[estion], cough prod[uctive]." Id. Plaintiff was noted to have congested sinuses, respiratory rhoncai and respiratory distress and a cardiovascular edema. Id.

On December 3, 2010, a physical residual functional capacity assessment was conducted.

Id. at 266-74. This assessment listed Plaintiff's primary diagnosis as diabetes, secondary diagnosis as hyperlipidemia, and other alleged impairments as "mild [osteoarthritis] of right knee." Id. at 266. Plaintiff was limited to lifting and/or carrying 50 pounds occasionally and 25 pounds frequently. Id. at 267. Plaintiff was limited to standing and/or walking for a total of 6 hours in a workday and sitting for 6 hours in a workday. Id. Plaintiff was unlimited in pushing/pulling. Id. It was also noted that "pain has been considered and does not further lower this RFC in any 12-month period." Id. at 273.

On December 10, 2010, Plaintiff visited Brannon. Id. at 296. "[Plaintiff] report[ed] that he [was] still having problems with getting restful sleep. [...] He remains unemployed. He has had his SSI examination for disability." Id. On December 17, 2010, Plaintiff visited Dr. Okpaku. Id. at 303. It is noted that Plaintiff's birthday is the next day and that his wife accompanied him; it is otherwise illegible. Id.

On December 28, 2010, Dr. Richard Gann conducted a psychiatric review. Id. at 275-88. Dr. Gann based Plaintiff's medical disposition upon "substance addiction disorders," and later detailed that "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above. Disorder polysubstance dependence." Id. at 275, 283. Plaintiff was given a mild limitation in activities of daily living and difficulties in maintaining social functioning and a moderate limitation in maintaining concentration, persistence or pace. Id. at 285. In reviewing Plaintiff's medical records, Dr. Gann noted, "[t]reatment notes from Dr Brannon on 10/18/10 'mood is happy.' Notes are sparse and sketchy, No [diagnosis]." Id. at 287. From the November 24, 2010 clinical evaluation, Dr. Gann noted, "[m]inimal [symptoms] reported. Minimal MSE changes. [...] 'He did not appear clinically depressed.' Comprehension

good." Id. Dr. Gann's review concluded, "[c]laimant's reports are partially credible." Id.

On December 28, 2010, Dr. Gann also conducted a mental residual functional capacity assessment. Id. at 289-92. Dr. Gann determined that Plaintiff was moderately limited in the following areas: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the general public, and the ability to respond appropriately to changes in the work setting. Id. at 289-90. Dr. Gann's assessment concludes:

> The claimant is able to understand, remember and carry out simple one and two step instructions and procedures.
>
> The claimant is able to maintain concentration, persistence and pace for periods of two hours. The claimant is able to perform activities within a schedule. The claimant is able to maintain regular attendance, be punctual and complete a normal workday and workweek. The claimant does not require special supervision. The claimant can work in coordination with or proximity to others without being distracted by them. The claimant is able to make simple work-related decisions.
>
> The claimant is able to relate adequately to coworkers and supervisors, ask simple questions and request assistance, accept instructions, and respond appropriately to criticism from supervisors.
>
> The claimant is able to respond appropriately to changes in the work setting, be aware of normal hazards, and take appropriate precautions.
>
> Based on [medical evidence of record] and claimant's psych meds, he obviously has additional mental impairments. However, there is no [medical evidence of record] supporting an additional impairment at this time. Treating source note "happy mood."

Id. at 291.

After his DIB and SSI applications were denied on December 29, 2010, Plaintiff visited Brannon on January 17, 2011. Id. at 13, 295. Brannon noted, "[Patient] reports that he continues to remain dealing with life. ... SS has denied him SSI. We discussed his concerns." Id. Plaintiff also visited Dr. Okpaku on this date. Id. at 302. Dr. Okpaku noted that Plaintiff's first wife died recently; the rest of the note is illegible. Id.

On February 2, 2011, Plaintiff presented for a checkup at "Physicians & Surgeons." Id. at 392, 435. The report contains illegible notes and a comment stating "mentally stable." Id. Plaintiff was noted as having respiratory distress and cardiovascular edema. Id. On February 17, 2011, Plaintiff visited Brannon complaining of "problems with his sleep and eating habits. He continues to take his meds as prescribed. His 'voices' are bothering him more since his last visit." Id. at 294. On the same day, Plaintiff visited Dr. Okpaku, whose note stated "[m]ood is good," but is otherwise illegible. Id. at 301. On March 17, 2011, Plaintiff returned to Dr. Okpaku. Id. 300. Dr. Okpaku reported that Plaintiff "feels good." Id. The note of Plaintiff's March 17, 2011 visit with Brannon is blank. Id. at 470.

On April 1, 2011, an abdominal ultrasound at HCIG, Inc. showed that Plaintiff had "elevated LFTs" and "fatty infiltrate of the liver." Id. at 433. The technician concluded, "[t]he liver is increased in echogenicity and difficult to penetrate compatible with fatty infiltration. ... Conclusion: Fatty infiltration of liver otherwise negative." Id.

On April 15, 2011, Dr. Reeta Misra conducted a medical evaluation of Plaintiff. Id. at 385-86. Dr. Misra listed Plaintiff's complaints as "[d]iabetes and high cholesterol. Discovered: Back and joint pain." Id. at 385. Dr. Misra noted that there was "[n]o worsening of physical allegations, no new physical allegations, new treatment [...] The current [medical evidence of

record] findings do not show anything that would warrant a change in the initial physical RFC." Id. Dr. Misra concluded "I have reviewed all the evidence in file, and the prior physical assessment of 12/03/10 is affirmed as written." Id.

On April 27, 2011, George Grubbs, Doctor of Psychology, conducted a medical evaluation of Plaintiff. Id. at 387. Dr. Grubbs stated "I have reviewed all available [medical evidence of record]'s in file. [...] Despite additional information provided from Okpaku [medical evidence of record]'s, Haney [medical evidence of record]'s [and] [claimant], I agree with [Psychiatric Review Technique]/[Medical RFC] completed on 12/28/10[.]" Id. On April 29, 2011, Plaintiff visited Dr. Okpaku. Id. at 469. Plaintiff "began to feel low back pain yesterday." Id.

On May 2, 2011, Plaintiff visited "Physicians & Surgeons." Id. at 398, 432. Plaintiff presented for a three-month followup, but also complained of "low back pain - sharp at times, hard to get up" and "urine dark per wife." Id. On May 3, 2011, Plaintiff's DIB and SSI claims were denied upon reconsideration. Id. at 13. On May 18, 2011, Plaintiff visited "Physicians & Surgeons." Id. at 397, 430. Plaintiff complained of a pharmacy not filling his Motrin prescription. Id. Plaintiff was noted as having a cardiovascular edema. Id.

Dr. Okpaku's note of Plaintiff's June 6, 2011 visit is illegible. Id. at 468. Dr. Okpaku's note is blank as to Plaintiff's June 23, 2011 visit. Id. at 467. On July 11, 2011, Plaintiff visited Dr. Okpaku. Id. at 466. Dr. Okpaku noted that Plaintiff was going to church. Id. Dr. Okpaku's note of Plaintiff's August 8, 2011 visit is illegible. Id. at 465.

On August 22, 2011, Plaintiff visited "Physicians & Surgeons." Id. at 396, 428. Plaintiff presented for a followup. Id. On September 13, 2011, Plaintiff visited "Physicians & Surgeons"

to complete social security paperwork. Id. at 395, 426.

On September 15, 2011, Plaintiff visited Dr. Okpaku, who reported that Plaintiff "has been feeling well[.] States his body is achy[.]" Id. at 464. On October 11, 2011, Plaintiff visited Dr. Okpaku. Id. at 463. Plaintiff stated he was "at 80 out of 100," and that he had "some good days and bad days." Id. On October 14, 2011, Plaintiff visited "Physicians & Surgeons." Id. at 394, 424. Plaintiff presented for a checkup with no complaints. Id.

On November 8, 2011, Plaintiff visited Dr. Okpaku. Id. at 462. Dr. Okpaku noted, "mood is good." Id. On December 8, 2011, Plaintiff returned to Dr. Okpaku. Id. at 461. Plaintiff reported that "'I feel pretty good today[.]'" Id. On December 14, 2011, Plaintiff visited "Physicians & Surgeons." Id. at 393, 422. Plaintiff presented for a followup, "[complaining of] back pain," lower right leg [pain] and a [sore throat/neck]." Id. On January 10, 2012, Plaintiff visited Dr. Okpaku; the note is illegible. Id. at 460. On February 7, 2012, Plaintiff returned to Dr. Okpaku; the note reads "otherwise doing well." Id. at 459.

On March 1, 2012, a representative at the Social Security Administration conducted a medical evaluation of Plaintiff. Id. at 414. The report states, "[p]lease note that additional evidence was submitted by attorney (evidence in file, [received] 2/29/12). After careful review of the evidence in file including the additional evidence [received], a Fully Favorable determination cannot be made on this claim. Therefore, this case will be processed as a ND and sent back to the ODAR office at this time." Id. On March 14, 2012, Dr. Okpaku noted that Plaintiff was "in the process of moving from Pulaski back here" but is otherwise illegible. Id. at 458.

On April 2, 2012, Plaintiff visited Dr. Robert Beck. Id. at 454. Plaintiff reported a dog

bite the previous week. Id. On April 2, 2012, Plaintiff had laboratory tests conducted. Id. at 451-53. The report noted, "kidneys are good," "liver enzymes are high," "'good' cholesterol is good," "'bad' cholesterol is too high (I want it <70)," "thyroid is normal," "diabetes is pretty well controlled," "you do not have HIV," "blood counts are good." Id. On April 16, 2012, Plaintiff presented for a followup with Dr. Beck, who noted that Plaintiff's "dog bite [was] better." Id. at 448. Plaintiff also had laboratory tests conducted. Id. at 449-50. On April 12, 2012, Plaintiff visited Dr. Okpaku, whose note is illegible. Id. at 457. Dr. Okpaku's May 14, 2012 note is illegible. Id. at 456. On September 24, 2012, the ALJ held a hearing on Plaintiff's disability claims. Id. at 13.

## B. Conclusions of Law

A "disability" is defined by the Social Security Act as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); see also 42 U.S.C. § 1382c(a)(3). A reviewing court's evaluation of the Commissioner's decision is based upon the record made from the administrative hearing process. Jones v. Sec'y, Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of review is limited to determination of (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Sec'y of Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).

Plaintiff contends that the ALJ erred by: (1) failing to find Plaintiff's diabetes to be a severe impairment; (2) failing to perform a function-by-function analysis for the RFC; (3) failing to consider Plaintiff's obesity; (4) failing to properly consider the opinions of Drs. Pettigrew and Gann.

Plaintiff asserts that the ALJ erred by failing to find Plaintiff's diabetes severe and failing to state sufficiently the reason for this conclusion. Regarding Plaintiff's diabetes, the ALJ concluded:

> The claimant also alleged diabetes, high cholesterol, chemical imbalance, diverticulitis, hypertension and hepatitis.
>
> The claimant's allegations of diabetes are confirmed in the medical record, but so is the fact that he is experiencing no problems with the diabetes and that his labs actually showed improvement in January of 2010, five months before the claimant's alleged onset date. Notes from the office visit on that date show that the claimant had no retinopathy and normal sensation to touch in both feet, along with normal pulses, no ankle jerks, no skin ulcers, no tinea infection and no calluses. Under the diabetes "assessment" the doctor wrote, "seems to be doing well." Blood tests from April 2012 show that the diabetes is "pretty well controlled." This impairment is not severe.

(Docket Entry No. 11 at 15-16).

Later medical records from Heritage Medical Associates include the DM (diabetes mellitus) diagnosis without additional commentary. Id. at 245. Plaintiff also presents records from "Physicians & Surgeons." None of these records mentions Plaintiff's diabetes. The medical record has a checklist of patient symptoms. In the "endocrine" section, Plaintiff is sometimes marked negative for symptoms. Id. at 392 and 396. On other occasions, the box is

not marked at all. Id. at 389, 390, 391, 393, 394, 395, 397 and 398. Plaintiff is never marked positive for endocrine symptoms.

On December 3, 2010, a physical residual functional capacity assessment was conducted, listing Plaintiff's primary diagnosis as diabetes. Id. at 266-74. Plaintiff was limited to lifting and/or carrying 50 pounds occasionally and 25 pounds frequently. Id. at 267. Plaintiff was limited to standing and/or walking for a total of 6 hours in a workday and sitting for 6 hours in a workday. Id. Plaintiff was unlimited in pushing/pulling. Id. The assessment reviewed the records from Heritage Medical: "1/18/10, labs show glucose 118, total cholesterol 152, trigs 81, HDL 44, LDL 92, HDL/chol. ratio 3.5. microalbumin negative, urinalysis negative exc. for trace of protein. Office visit 5/28/10 shows no evidence of EOD due to diabetes or cholesterol. Retinal eye exam normal." Id. at 273.

On April 15, 2011, Dr. Misra's medical evaluation noted Plaintiff's allegation of diabetes, but determined that there was "[n]o worsening of physical allegations, no new physical allegations, new treatment." Id. at 385. Dr. Misra noted a medical visit from February 2, 2011 as showing "no evidence of listing level end-organ damage." Id. Dr. Misra affirmed the December 3, 2010 RFC. Id.

Plaintiff identifies several instances of lab results showing high glucose. The first, from January 28, 2010, is the same appointment at which Dr. Paul Gentuso from Heritage Medical Associates said Plaintiff's diabetes "seems to be doing well." Id. at 257. Although "Physicians & Surgeons" ordered other laboratory tests, there are not any medical reports from "Physicians & Surgeons" that mention Plaintiff's diabetes.

The ALJ also mentions Plaintiff's diabetes in discussing the RFC. The ALJ states that

12

Plaintiff "gets dizzy if he gets up quickly," which is what Plaintiff identified as "the main symptom" of his diabetes. Id. at 18 and 36. The ALJ considered Plaintiff's obesity both when determining Plaintiff's severe impairments and when developing the RFC. "Since the ALJ considered the Plaintiff's diabetes ... when considering the Plaintiff's residual functional capacity, the Court finds it 'unnecessary to decide whether the ALJ erred in classifying the impairments as non-severe at step two.'" Brooks v. Astrue, No. 3:09-cv-432, 2011 WL 652839, at *8 (E.D. Tenn. Jan. 26, 2011) (quoting Fisk v. Astrue, 253 F. App'x 580, 583 (6th Cir. 2007)).

Next, Plaintiff asserts that the ALJ failed to perform a function by function RFC. Specifically, the ALJ did not provide a restriction for pushing and pulling. Plaintiff notes SSR 96-8p that states "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." The assessment of physical abilities includes "sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)[.]" 20 CFR 404.1545(b). The ALJ's RFC included restrictions for sitting, standing, walking, lifting, and carrying, in addition to several mental restrictions. (Docket Entry No.11 at 17).

Dr. James Moore and Dr. Misra, the consultant physicians, did not restrict Plaintiff in pushing or pulling, nor has Plaintiff alleged that he suffers from a pushing or a pulling restriction. The physical RFC performed on December 3, 2010 checked "unlimited, other than as shown for lift and/or carry" in the section for pushing and/or pulling. Id. at 267. The RFC was affirmed on

April 15, 2011. Id. at 385. "Although SSR 96-8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." Delgado v. Comm'r of Soc. Sec., 30 F. App'x 542, 547 (6th Cir. 2002) (see also Collette v. Astrue, No. 2:08-cv-085, 2009 WL 32929 (E.D. Tenn. Jan. 6, 2009)). The ALJ generally discussed the medical and other evidence that informed the RFC. As such, Plaintiff's claim fails.

Plaintiff asserts that the ALJ did not adequately evaluate Plaintiff's obesity or the effects of his obesity on his other physical conditions as required by SSR 02-1p. Yet, the ALJ included obesity as the first of Plaintiff's severe impairments and specifically stated:

> The claimant also suffers from obesity, which can obviously complicate other conditions. There is no specific level of weight or Body Mass Index (BMI) that equates with a "severe" or a "not severe" impairment. Neither do descriptive terms for levels of obesity (e.g., "severe," "extreme," or "morbid" obesity) establish whether obesity is or is not a "severe" impairment for disability program purposes. Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe. There is no indication in the medical record that the claimant's weight increases his limitations beyond those described in his residual functional capacity as assigned above.

(Docket Entry No. 11 at 21).

"Social Security Ruling 02-01p does not mandate a particular mode of analysis. It only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations. It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants." Bledsoe v. Barnhart, 165 F. App'x 408, 411-12 (6th Cir. 2006). Here, the ALJ adequately addressed Plaintiff's obesity and the reasoning for finding it has no effect on Plaintiff's other physical impairments.

Finally, Plaintiff alleges that the ALJ incorrectly relied upon the evaluations of Drs. Pettigrew and Gann. As to Dr. Pettigrew, Plaintiff contends that the ALJ gave both too much and not enough consideration to Dr. Pettigrew's opinion. On December 5, 2010, Dr. Pettigrew completed a psychological evaluation. (Docket Entry No. 11 at 262-265). Plaintiff was evaluated in person and did not provide any medical records. Id. at 262. Dr. Pettigrew did not find Plaintiff's report to be credible and opined that "information [Plaintiff] provided is considered to be of somewhat questionable reliability." Id. Dr. Pettigrew concluded that "information derived from this evaluation is not thought to have sufficient validity to definitely support a diagnosis of schizophrenia or any other psychotic disorder. The examiner recommends that further testing involving validity measures be considered." Id. at 265.

Plaintiff asserts that because the ALJ gave significant weight to Dr. Pettigrew's opinion, the ALJ should have ordered additional testing. Yet, an ALJ is not required to order additional testing unless a plaintiff can show that additional testing is necessary for the ALJ to reach a decision:

> Plaintiff's argument is not compelling because it down plays a key factor present in this case. While [Plaintiff] contends that the ALJ's decision should be reversed because he did not fully and fairly develop the record by failing to request an *additional* consultative examination, [Plaintiff] has not confronted the fact that there was a consultative examination performed in this case, the results of which were inconclusive because of Plaintiff's malingering. ... Although requesting another consultative examination *may* have elicited additional information regarding Plaintiff's mental functioning, Plaintiff has not come forward with evidence showing that an additional examination was *necessary* in order for the ALJ to render a decision on [Plaintiff's] application.

Lovejoy v. Comm'r of Soc. Sec., 2011 WL 5434011, at *5 (N.D. Ohio Nov. 8, 2011) (emphasis in original).

15

Further, Plaintiff contends that because the ALJ did not order additional testing, he should not credit Dr. Pettigrew's opinion. The only finding made by Dr. Pettigrew relevant to the RFC is that "Mr. Hosendove demonstrated that he is able to understand, remember and carry out simple verbal instructions." (Docket Entry No. 11 at 265). Yet, the ALJ also gave significant weight to Dr. Gann's opinion that affirmed Dr. Pettigrew's limitation by also finding that "[t]he claimant is able to understand, remember and carry out simple one and two step instructions and procedures." Id. at 291. Thus, the ALJ's reliance on Dr. Pettigrew's opinion was reasonable.

Next, Plaintiff asserts that the ALJ erred by construing Dr. Gann's limitation that "[t]he claimant is able to understand, remember and carry out simple one and two step instructions and procedures" as "[Plaintiff] could not carry out complex or detailed instructions." Id. at 291, 49. The ALJ is not required to defer to the opinion of a medical consultant, even if the ALJ has given that opinion significant weight. "Under 20 CFR 404.1527(e) and 416.927(e), some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case ... The following are examples of such issues: ... 2. What an individual's RFC is[.]" SSR 96-5p. Additionally, the interpretation of "complex" as more than "one to two step" is common. Swartz v. Barnhart, 188 F. App'x 361, 366 (6th Cir. 2006) and Rooney v. Barnhart, 114 F. App'x 174, 177 (6th Cir. 2004). As such, the ALJ's determination that Plaintiff can "remember and carry out simple one and two step instructions" is a restatement of Dr. Gann's limitation that Plaintiff cannot carry out complex – more than one or two step – instructions.

Finally, Plaintiff contends that the ALJ erred by including in the RFC that Plaintiff

16

"cannot maintain attention or concentration for more than two hours without interruption," but not stating specifically how long a break Plaintiff required or for how many two hour periods in a workday Plaintiff could concentrate. Yet, "breaks every two hours are normal and assumed in most jobs." Rudd v. Comm'r of Soc. Sec., 531 F. App'x 719, 730 (6th Cir. 2013) (citing SSR 96-9p). See also Vaughn v. Soc. Sec. Admin., No. 3:12-0458, 2014 WL 1775581, at *8-9 (M.D. Tenn. May 2, 2014). There is not any error in this determination.

For these reasons, the Court concludes that the ALJ's decision is supported by substantial evidence and should be affirmed and that Plaintiff's motion for judgment on the record (Docket Entry No. 16) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the 31st day of August, 2015.

WILLIAM J. HAYNES, JR.
Senior United States District Judge